ALB:RMP
F. #2019R01450

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

IN THE MATTER OF THE SEARCH OF
THE PREMISES KNOWN AS
PITKIN KING DELI CORP, 1742 PITKIN
AVENUE, BROOKLYN, NEW YORK
11212

**TO BE FILED UNDER SEAL**

**APPLICATION FOR A
SEARCH WARRANT**

Case No. 21-MJ-1166

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, LISA BARRETTI, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as Pitkin King Deli

Corp., 1742 Pitkin Avenue, Brooklyn, New York 11212, hereinafter "PREMISES," further

described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the United States Department of Agriculture

("USDA"), Office of the Inspector General, and have been since 2009.  During the course of my

career, I have been involved in many investigations relating to violations of federal law,

including different forms of benefits fraud, and I have participated in the execution of search

warrants, debriefings of cooperating witnesses and informants, and received training in various

investigative techniques.

3.　　　Since approximately 2019, I have been involved in a criminal investigation of the

Pitkin King Deli Corp. (the "Deli") and certain individuals associated with the Deli for, inter alia,

violations of 7 U.S.C. § 2024 (food stamp fraud) and 18 U.S.C. §§ 371 (conspiracy to defraud

the United States), 641 (theft of public funds) and 1343 (wire fraud).

4.　　　This affidavit is intended to show only that there is sufficient probable cause for

the requested warrant and does not set forth all of my knowledge about this investigation.

## BACKGROUND

5.　　　The "Supplemental Nutrition and Assistance Program" ("SNAP") is administered

by the USDA's Food and Nutrition Service ("FNS") and utilizes federal tax dollars to subsidize

low income households, affording such households the opportunity to achieve a more nutritious

diet by increasing their food purchasing power.  The SNAP is the new name of the Food Stamp

Program, as a result of the Food, Conservation, and Energy Act of 2008 (P.L. 110 246), also

known as the Farm Bill.  The new name, effective October 1, 2008, more accurately reflects the

Program's mission to provide food assistance and nutrition education to assist participants as

they move to a healthier lifestyle and self-sufficiency.

6.　　　In New York, individuals who receive SNAP benefits ("Recipients") no longer

redeem their benefits using paper food stamps coupons.  Recipients now redeem their SNAP

benefits electronically through the use of what is known as an Electronic Benefit Transfer

2

("EBT") card.  The SNAP EBT cards operate much like automated teller machine ("ATM")

cards used by banks.  At the beginning of each month, a SNAP recipient's EBT card is credited

with a dollar amount of food stamps benefits for that month.

7.      The EBT cards are used by recipients to purchase eligible food items at retail food

stores ("retailers") that are authorized by FNS to participate in the SNAP.  Each authorized

retailer has a specific EBT terminal located in the store.  As a purchase is made, the retailer runs

the EBT card through the EBT terminal.  The recipient enters a personal identification number

("PIN") on a keypad, and the amount of the purchase is deducted from the recipient's EBT card.

The EBT terminal generates a receipt for each transaction, and the balance remaining in the

recipient's account for the month is displayed on the receipt.  The amount of the recipient's

purchase is then electronically credited to the retail food store owner's bank account, via a

previous arrangement between the retailer and the FNS.

8.      SNAP benefits may be accepted by authorized retailers only in exchange for

eligible food items.  According to FNS regulations, most edible items, with the exception of

prepared foods, vitamins and medicines, are eligible for purchase with SNAP benefits.  Items

such as beer, cigarettes, paper goods and soaps are not eligible for purchase with SNAP benefits.

It is a violation of the rules and regulations governing the SNAP to allow SNAP benefits to be

used to purchase ineligible items.  SNAP benefits may not lawfully be exchanged for cash under

any circumstances.  Exchanging SNAP for cash is known as "trafficking," and is a violation of

the rules and regulations governing the SNAP.  Finally, retailers may not permit recipients to run

3

credit accounts and pay off such accounts with SNAP benefits from their EBT cards.  Doing so is a violation of the rules and regulations governing the SNAP.

9.      All food retailers, prior to receiving authorization to participate in the SNAP and to process EBT transactions for recipients, must submit an Application for Authorization to Participate in the SNAP (the "Application") to FNS.  In order to execute the Application, the applicant must attest that he or she has read the Warnings and Certification which is sent to retailers along with the application documents.  The Warnings and Certification provides that, by his/her signature on the application, the applicant is attesting to understanding that he/she, and the persons on behalf of whom the application is submitted, are responsible for ensuring that all employees at the store, both paid and unpaid, comply with SNAP rules and avoid engaging in unauthorized activity such as trading cash for food stamp benefits (trafficking).

10.     The Application also requires the applicant to disclose certain information about the applicant's store to FNS so FNS can determine whether the applicant is eligible to participate in the SNAP.  The required information includes, inter alia: (a) the store's actual or estimated annual gross sales and food sales; (b) the types of products sold; (c) the number of individuals employed; (d) the quantity and type of cash registers used and (e) the bank account designated to deposit all food stamp proceeds.  All applicants also receive training from FNS regarding proper conduct as a participating retailer in SNAP.  The training makes clear that the SNAP prohibits exchanging SNAP benefits for cash and selling ineligible items.

11.     A typical, legitimate transaction utilizing an EBT card begins when an authorized

benefit recipient, carrying his or her own EBT card, enters a retail store authorized by FNS to

accept SNAP benefits.  The benefit recipient gathers non prepared food items that are eligible for

purchase with SNAP benefits.  The recipient presents those items to the store clerk for purchase,

along with his/her EBT card.  The clerk adds the total cost of all items presented for purchase

and enters that amount into the store's EBT terminal.  The EBT card is then "swiped" and the

recipient enters his/her PIN.  If the EBT card has a SNAP balance sufficient to cover the

purchase total, the transaction is completed and the total amount of the purchase is electronically

deducted from the recipient's card balance.  The same amount of the transaction is electronically

transferred to the retailer's designated bank account, using federal funds that originate from FNS.

12.     As a result of my training and experience, I have become familiar with a number

of schemes employed by individuals and entities to defraud the SNAP.  In one such scheme,

retailers permit recipients to purchase ineligible items with SNAP benefits, charging the

recipients a premium for allowing them to do so.  In another scheme, retailers permit recipients

to run credit accounts, often involving ineligible items, and to pay off such accounts using SNAP

benefits and their EBT cards.  Finally, as explained above, another scheme involves trafficking,

when retailers exchange SNAP benefits for cash.

13.     Retailers who exchange SNAP benefits for cash usually do so at a discounted rate,

sometimes as high as 50 percent or more of the full value of the SNAP benefits.  For example, a

retailer engaging in trafficking would enter a $100 transaction against a recipient's EBT card

balance and give the recipient only $50 or $70 in cash, depending upon the discount rate.  This practice results in profiteering by traffickers, misuse of government funds intended to provide food for needy families and the creation of a market for stolen or fraudulently obtained SNAP benefits.

14.     Many retailers are aware that FNS is able to detect and monitor certain types of suspicious EBT transactions.  Retailers know that large SNAP transactions of $50 or more, especially those that total an even dollar amount, are one such category of transactions that can raise suspicion and invite scrutiny.  Accordingly, retailers who engage in trafficking often attempt to avoid detection by running two or more EBT transactions within a short time period, often just a minute or two apart.  For example, a retailer engaging in trafficking might run two back to back transactions in the amounts of $61.91 and $58.09.  Doing so enables the retailer to run a large, even dollar total transaction (i.e., $120) without an even dollar amount showing up in the transaction record (i.e., $61.91 and $58.09).  FNS, however, is now able to track these rapid or "back to back" transactions.  In order to further evade detection, some retailer will insist that recipients leave their EBT cards with the retailer and provide their personal identification numbers to the retailer.  This enables the retailer to engage in trafficking by running several relatively small EBT transactions with the recipients' cards over an extended period of time, thereby making it difficult for FNS to detect the trafficking.

6

**PROBABLE CAUSE**

15.     Since February 21, 2017, the Deli has been an authorized retailer participating in

SNAP from its location at the PREMISES.  The Deli is a small to mid-sized corner convenience

store or bodega, of a type that is very common in Brooklyn and throughout New York City.

Based upon photos and videos of the inside of the store and government records that I have

reviewed, I know that the Deli is approximately 775 square feet and stocks primarily pre-

packaged and canned foods and snacks.  It has two aisles, no storage, and no shopping carts or

baskets.  It stocks no fresh meat and has minimal fresh produce.  It has one register and one

point-of-sale system.  A photograph of the storefront is included in Attachment A.

16.     Beginning in 2017, the USDA's routine analyses of the Deli's SNAP transactions

revealed patterns of suspicious activity.  Specifically, analyses revealed that the Deli processed a

statistically improbable number of transactions ending in the same number of cents; patterns of

multiple transactions from the same individual benefit accounts in unusually short time frames;

and purchase transactions that appear excessively large in light of average purchase data from

comparable stores and the food items and quantities known to be stocked at the Deli.

17.     USDA redemption data has also been used to compare the amount of SNAP

benefits redeemed by the Deli at the PREMISES with similar stores in the same region.  These

comparisons are highly probative of fraudulent SNAP transactions.  They show, among other

things, that every month between and including April 2019 and August 2021 (the most recent

month for which complete data are available), the average dollar value of SNAP benefits redeemed per transaction at the Deli was far higher than, and most months more than double, the average per-transaction value redeemed by comparable convenience stores.  The chart below reflects this disparity, with (from left) red bars representing the Deli's monthly averages, blue bars representing the monthly averages of convenience stores in New York State, green bars representing the monthly averages of convenience stores in Brooklyn, and purple bars representing the monthly averages of convenience stores in Queens.



18.    In addition to a far higher per-transaction value, the Deli has also redeemed SNAP benefits in a far higher number of total transactions than other convenience stores.  This, too, is highly probative of fraudulent transactions.  The combination of far higher per-transaction values and a far greater number of transactions has resulted in a vastly higher dollar volume of all

SNAP benefits redeemed—in some months a double-digit multiple of the transaction volume that would be statistically expected based upon comparisons to other convenience stores. The chart below reflects this disparity, showing total purchase dollar volume data for the same months and with the same color-coding as the chart above.



19.     In sum, the transaction data reflect a volume and size of SNAP redemptions at the Deli that are extraordinarily implausible statistically and are far out of proportion with the size of the Deli and the grocery stocks it is known to maintain.

20.     Between April 2019 and September 2021, the aggregate amount of SNAP transactions processed by the Deli at the PREMISES that individually exceeded $25—which is one method of estimating probable loss to the government from fraudulent transactions—is

approximately $2.94 million.  The aggregate amount of SNAP transactions exceeding $50 in that same time frame—which is a very conservative estimate of the loss to the government—is approximately $2.39 million dollars.

21.     Based in part upon the above suspicious activity, the USDA initiated a criminal investigation which has involved surveillance of the PREMISES and the use of covert transactions with a confidential human source ("CHS").  On numerous occasions since 2019, a CHS has been sent into the PREMISES with an undercover EBT card while wearing or carrying objects with concealed audio and video recording equipment.  I have reviewed the recordings and debriefed the CHS after each covert transaction.  In each instance, the CHS has taken a small quantity of food to the counter, presented the EBT card to pay for the food, and has requested cash back.  On most occasions, the individual at the register has given the CHS cash back in the quantity requested, and has charged a larger amount to the EBT card, reflective of an illicit "fee" charged for the disbursement of cash.  On several occasions, while there has been a uniformed police presence inside or in front of the Deli, the individual at the register has told the CHS to come back at another time.

22.     Specifically, since August 2019, the Deli has completed eight such trafficking transactions with the CHS, which were surreptitiously recorded, the most recent of which was completed on September 16, 2021.  These recorded transactions comprise $693.78 in unlawful EBT charges, including $293.78 kept as an illicit "fee" by the Deli—reflecting an average "fee" of over 40%.

23.     Accordingly, based upon the above statistical analyses and surreptitiously recorded undercover transactions, I submit that there is probable cause to believe that the Deli and/or employees of the Deli have committed violations of 7 U.S.C. § 2024 (food stamp fraud) and 18 U.S.C. §§ 371 (conspiracy to defraud the United States), 641 (theft of public funds) and 1343 (wire fraud), and that evidence and fruits of such crimes are at the PREMISES.

## CONCLUSION

24.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

## REQUEST FOR SEALING

25.     It is respectfully requested that this Court issue an order sealing, until the

execution of the search warrant, all papers submitted in support of this application. I believe that

sealing this document is necessary because the items and information to be seized are relevant to

an ongoing criminal investigation. Premature disclosure of the contents of this affidavit and

related documents may result in the destruction of evidence and have a significant and negative

impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

_____
LISA BARRETTI
Special Agent
United States Department of Agriculture,
Office of Inspector General

Subscribed and sworn to before me
by telephone on October __12_, 2021:

_____
HO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

12